IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DAVID LAMBERTSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 07-524-SLR |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| | ) | |
| Defendant. | ) | |

John S. Grady, Esquire of Grady & Hampton LLC, Dover, Delaware.  Counsel for Plaintiff.

David C. Weiss, Esquire, acting United States Attorney, District of Delaware, and Dina White Griffin, Esquire, Special Assistant United States Attorney, District of Delaware, Counsel for Defendant.

**MEMORANDUM OPINION**

Dated:  June 8, 2009
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

David Lambertson ("plaintiff") appeals from a decision of Michael J. Astrue, the

Commissioner of Social Security ("defendant"), denying his application for supplemental

security income ("SSI") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.

Plaintiff has filed a motion for summary judgment asking the court to reverse

defendant's decision and award him SSI. (D.I. 15) Defendant has filed a cross-motion

for summary judgment, requesting the court to affirm his decision and enter judgment in

his favor. (D.I. 17) The court has jurisdiction over this matter pursuant to 42 U.S.C.

§ 405(g).[1]

## II. BACKGROUND

### A. Procedural History

Plaintiff applied for SSI on September 29, 2004 alleging disability since

September 15, 1997 due to back injury, numbness in his left leg and depression. (D.I.

13 at 93-95, 104) Plaintiff worked as a painter from 1979 to September 1997 and was

39 years old at the time his application was filed.[2] (*Id.* at 24, 105) Plaintiff's claim was

---

[1] Under § 405(g),

[a]ny individual, after any final decision of the Commissioner of Social
Security made after a hearing to which he was a party . . . may obtain a
review of such decision by a civil action commenced within sixty days after
the mailing to him of notice of such decision . . . . Such action shall be
brought in the district court of the United States for the judicial district in
which the plaintiff resides . . . .

42 U.S.C. § 405(g).

[2] Plaintiff is a "younger individual" as defined by 20 C.F.R. 416.963 (under age
50). According to that statute, a claimant's age is generally not considered to affect his
"ability to adjust to other work" in the context of vocational considerations. However,

denied initially on February 14, 2004 and upon reconsideration on October 14, 2005. (*Id.* at 14) Plaintiff requested a hearing before an administrative law judge ("ALJ") on February 14, 2006 which hearing was conducted on February 22, 2007. (*Id.*) After receiving testimony from plaintiff and a vocational expert ("VE"), the ALJ decided on May 19, 2007 that plaintiff is not disabled within the meaning of the Social Security Act, specifically, that plaintiff can perform other work that exists in the national economy. (*Id.* at 25) Plaintiff's subsequent request for review by the Appeals Council was denied. (*Id.* at 5-10) On August 29, 2007, plaintiff brought the current action for review of the final decision denying plaintiff SSI. (D.I. 2)

## B. Plaintiff's Work History

Plaintiff has a high school education and past relevant work as a painter. In 1998, plaintiff underwent "cage fusion" lumbar surgery as the result of a 1994 accident where plaintiff fell off scaffolding. (D.I. 13 at 231) Plaintiff testified that he was out of work following the 1994 accident for eight to ten months, then returned to light duty work until his surgery.[3] (*Id.* at 381) He did not return to work after the surgery. (*Id.*)

Plaintiff has a history of alcohol and substance abuse. As relevant to the instant matter, plaintiff began using heroin in 2000 and stopped in 2003 upon his treatment in a rehabilitation facility. (*Id.* at 183) Plaintiff also related a history of overuse of pain killers in conjunction with his alcohol abuse. (*Id.*) As relevant to his work history, plaintiff

"persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45." *Id.*

[3]Plaintiff testified that his surgery was in 1997 (D.I. 13 at 381) while his physician's report states that the surgery occurred in 1998 (*id.* at 231).

2

reported that he "supported his [drug] habit by working for a drug dealer" during the 2000 to 2003 time period. (*Id.*) Plaintiff's rendition of the relevant medical evidence begins in 2004. (D.I. 16 at 1)

### C. Medical Evidence

Plaintiff first consulted with Dr. Asit P. Upadhyay, D.O. ("Upadhyay") of Delaware Back Pain and Sports Rehabilitation Centers on October 7, 2004. (D.I. 13 at 231) At that time, Upadhyay conducted a physical examination and noted three "impressions": (1) "chronic low back pain status post LS cage fusion"; (2) "acute left radicular symptoms"; and (3) "depression with tobacco abuse." (*Id.* at 232) Upadhyay prescribed Methadone, Percoset and DayPro medication for pain, Wellbutrin for sleep and spasms at night, and ordered both spinal X-rays and a spinal MRI. (*Id.* at 233) Upadhyay also referred plaintiff to psychotherapy for smoking cessation. (*Id.*)

An MRI taken October 19, 2004 revealed a mild disc bulge at L3 L4, a metallic artifact at L4 L5 relating to plaintiff's fusion surgery, "no significant residual disc bulge or protrusion" at L4 L5, and a mild disc bulge and mild ligamentous and facet hypertrophy at L5 S1. (*Id.* at 326) The radiologist noted no change from December 29, 2003, severe degenerative disc disease at L5 S1, moderate disease at L4 L5 and T12 L1, and unchanged chronic mild wedging at the superior endplate of L1. The impression was chronic degenerative disease of the lumbar spine. (*Id.* at 327) Plaintiff saw Upadhyay again on October 20, 2004 whereupon Upadhyay noted chronic low back pain and "depression secondary to chronic illness," and prescribed Avinza for pain in addition to continuing his anti-inflammatory medications. (*Id.* at 234) Upadhyay noted that plaintiff

3

had a non-antalgic[4] gait and "move[d] about the exam room without difficulty, able to mount and dismount the exam table readily." (*Id.*)

On November 4, 2004, Upadhyay had another follow-up with plaintiff at which he noted that plaintiff's MRI "showed a CAGE fusion without any other recurrent disc herniations or surgical pathology," that plaintiff's pain was improved with medication, and that plaintiff was seeing a psychologist. (*Id.* at 235) Upadhyay again noted that plaintiff had a non-antalgic gait and "move[d] about the exam room without difficulty, able to mount and dismount the exam table readily." (*Id.*) Upadhyay started Trazodone medication for sleep. (*Id.*) A November 16, 2004 MRI revealed "postoperative change at the L4 L5 level," "degenerative disease," and "no instability." (*Id.* at 325)

On December 2, 2004, Upadhyay noted that plaintiff complained of significant left leg pain, and ordered an EMG of the left leg. (*Id.* at 236) Upadhyay noted "anxiety secondary to chronic illness" and ordered that plaintiff discontinue Trazodone and start Zonegran medication for sleep. (*Id.*) Plaintiff's EMG came back normal on December 15, 2004. (*Id.* at 238) Upadhyay again noted that plaintiff had a non-antalgic gait and "move[d] about the exam room without difficulty, able to mount and dismount the exam table readily." (*Id.*)

Upadhyay saw plaintiff on January 6, 2005, at which time he noted an increase in back pain correlating to the drop in temperature. (*Id.* at 239) Upadhyay noted that plaintiff was depressed and had yet to establish a social network since recently moving to the Dover area. (*Id.*) Upadhyay discontinued DayPro, started Voltaren medication,

---

[4]An antalgic gait is, generally, a gait abnormality where an individual favors certain motions to avoid pain.

4

and counseled plaintiff regarding sleep, his sedentary activity level, and social engagement. (*Id.*) Upadhyay again noted that plaintiff had a non-antalgic gait and "move[d] about the exam room without difficulty, able to mount and dismount the exam table readily." (*Id.*)

Plaintiff saw Upadhyay on February 18, 2005 and reported that he re-injured his back two weeks prior while sweeping snow. (*Id.* at 165) Upadhyay noted that plaintiff's pain was "previously well controlled." (*Id.*) Upadhyay also noted a "key exacerbation" of plaintiff's low back pain." (*Id.*) He prescribed steriods, Norco for severe pain, and Dopexin for sleep; Trazodone was discontinued. (*Id.*) Upadhyay also recommended a physical therapy program.[5] (*Id.*)

In March 2005, plaintiff complained that he was not improved. Upadhyay noted "right flank pain" and ordered a cat scan. (*Id.* at 242) That test was negative.[6] (*Id.* at 244) Upadhyay diagnosed a urinary tract infection with right flank pain and referred plaintiff for epidural sterine injections for chronic back pain. (*Id.*)

On May 2, 2005 plaintiff presented to Upadhyay with an ankle cast. Upadhyay changed his prescription from Daypro to Voltaren for insurance reasons and noted that he was awaiting an evaluation for lumbar injections. (*Id.* at 245) An MRI report dated May 2, 2005 revealed a "healing calcaneal fracture" in plaintiff's ankle. (*Id.* at 316)

On May 24, 2005, plaintiff had an initial consultation with Rachael Smith, D.O.

---

[5]There appear to be no physical therapy records before the court; the parties point to none.

[6]Upadhyay noted that a urine test showed "traces of estrace," an estradiol drug (a form of estrogen) typically used to treat symptoms of menopause and to prevent osteoporosis, occasionally it is used to treat cancer in males.

5

Case 1:07-cv-00524-SLR Document 21 Filed 06/08/09 Page 7 of 32 PageID #: 108

("Smith"), also of Delaware Back Pain and Sports Rehabilitation Centers, regarding an evaluation for possible injections for low back and leg pain. (*Id.* at 247) Smith noted that plaintiff fractured his left foot in a "brawl" approximately seven weeks earlier and was scheduled (through another physician) to have his cast removed the following week. (*Id.*) Smith noted a history of low back pain and radiating pain in plaintiff's left leg. (*Id.*) Smith also noted the following radiologic history: "MRI of [the] lumbar spine November 2004, [showing] diskectomy and fusion at L4-5, old L1 compression fracture, facet sclerosis, and degenerative disc disease L5-S1. Lumbar spine x-ray showed severe degenerative disc disease L5-S1 and the fusion at L4-5." (*Id.* at 248) Upon examination, Smith noted chronic low back pain, severe degenerative disc disease L5-S1, and referred leg pain, and recommended a "fluoroscopically guided caudal epidural corticosteriod injection." (*Id.*) The injection was performed on June 27, 2005. (*Id.* at 250-51)

Plaintiff saw Upadhyay again on May 29, 2005 with complaints of significant leg pain and lack of sleep. (*Id.* at 252) Upadhyay noted that he adjusted plaintiff's medications (adding Paxil for sleep and Cymbalta for leg pain), and counseled plaintiff for a half hour regarding depression, ultimately recommending that plaintiff see a psychiatrist.[7] (*Id.*) On July 12, 2005, Smith noted "significant improvement" in left leg pain from the epidural injection, but that some of this improvement may have been due to "limping from the heel fracture." (*Id.* at 253)

On July 20, 2005, plaintiff saw Dr. Jeffrey C. Barton, DPM, FACFAS ("Barton"), a

---

[7]Upadhyay noted that plaintiff was scheduled to be married two weeks prior but this did not occur. (D.I. 13 at 252)

6

podiatrist, regarding pain and swelling in his ankle and foot. (*Id.* at 228) Plaintiff stated he injured his ankle in a fall off a 12-foot balcony in April 2005. (*Id.*) Barton noted that plaintiff was in treatment with "Dr. Hermantin" for eight weeks, which treatment included a cast, but he was discharged.[8] (*Id.*) Barton did not believe plaintiff was "a candidate for any type of surgical intervention to correct [his] fracture now at this late time." (*Id.*) He prescribed Naprosyn and an ankle brace. (*Id.*) At a follow-up on August 22, 2005, Barton provided an injection to the sinus tarsi and prescribed Vicotin for severe pain. (*Id.*) Barton noted that plaintiff felt an improvement from wearing a brace. (*Id.*)

In August 2005, plaintiff was examined by psychiatrist Janice Chester ("Chester"). Chester noted that plaintiff had a "brief incarceration" three months prior and has "a history of multiple arrests."[9] (*Id.* at 184-85) Regarding plaintiff's activities, plaintiff indicated that he "does light cleaning" but no cooking and little shopping. (*Id.* at 184) Chester's impressions were as follows: (1) "polysubstance dependance (opiates and alcohol) in recent remission[,] dysthymia;" (2) "personality disorder not otherwise specified;" (3) "hepatitis C, status post spinal fusion;" (4) "difficulty with intimate relationships"; and a global assessment of functioning ("GAF") of "currently 50 and highest in the last year is also 50."[10] (*Id.* at 185)

---

[8]A "Case Analysis" dated September 28, 2005 by Dr. Kumar Swami states that plaintiff was "in an altercation and had fractured his left calcaneus," which was treated by Dr. Hermantin. (D.I. 13 at 221)

[9]It is unclear to the court what criminal allegations underlie plaintiff's arrests and incarceration.

[10]The ALJ explained in her opinion that "[a]ccording to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, a GAF of 50 indicates moderate difficulty in social, occupational, or school functioning." (D.I. 13 at 22)

On August 25, 2005, Upadhyay also noted an improvement in plaintiff's leg pain, but noted new complaints of left elbow swelling. (*Id.* at 255)  Plaintiff was not sleeping well and "continue[d] to have issues with stress and family matters at home." (*Id.*)  Upadhyay noted that plaintiff "needs to focus on eliminating his social stressors in order to help him better manage his back pain problems." (*Id.* at 256)  Plaintiff's elbow had improved by September 2005. (*Id.* at 257)

Plaintiff continued to follow up with Upadhyay for low back pain through the fall of 2005.  In November 2005, Upadhyay changed plaintiff's sleep medication and renewed his prescriptions for Percocet and Avinza for pain. (*Id.* at 260)  On December 15, 2005, Upadhyay noted that plaintiff had pain with prolonged sitting and standing, and was seeing a psychologist but not a psychiatrist for depression. (*Id.* at 261)  Upadhyay recommended plaintiff seek vocational rehabilitation and be evaluated for sedentary desk work, as plaintiff had not worked since 1998. (*Id.*)  Upadhyay rewrote the prescription for vocational rehabilitation in January 2006. (*Id.* at 263)  At that time, plaintiff described "sharp, shooting, achy" back pain that was "worse when walking or standing" than at rest; Upadhyay did not change his medications. (*Id.*)  A prescription for psychiatry consultation was also rewritten. (*Id.* at 264)

In January 2006, plaintiff began treating with Dr. Glen D. Rowe, D.O. ("Rowe"). (*Id.* at 360)  Plaintiff presented to Rowe's office on January 3, 2006 with left ankle pain.[11]  Plaintiff communicated to Rowe that he had back surgery in 1998 and a "left foot bunionectomy" in 2004. (*Id.*)  An MRI was ordered and prescriptions for Valium

---

[11]Plaintiff was seen on this date by Jack Milligan, M.D.

8

and Percoset were issued. (*Id.*) It was noted that plaintiff was not wearing his prescribed brace or lace-up ankle support, and had a decreased range of motion with pain and tenderness. (*Id.* at 360) On February 7, 2006, plaintiff treated with Rowe and reviewed the MRI, which indicated "a healing subacute fracture of the calcaneous and also . . . a possible osteomyelitis." (*Id.* at 361) Rowe's treatment notes indicate that plaintiff stated that he "injured his heel in April [ ] 2005 when he lost his balance on a balcony and had jumped down[.]" (*Id.* at 356)

Upadhyay saw plaintiff on February 9, 2006. On that date, Upadhyay noted that plaintiff was "painting last week" and having increased pain symptoms this week. (*Id.* at 265) Upadhyay noted "generalized anxiety disorder," changed plaintiff's sleep medication once more,[12] and again requested that plaintiff seek a psychiatrist in addition to his current counseling. Upadhyay stated that "I think the patient wants to go, he is just not sophisticated enough to understand the importance of the visit and to schedule such." (*Id.*)

Upadhyay saw plaintiff in March 2006 for back pain and for new complaints in neck pain following his start of part time work painting, noting that plaintiff had no prior history of neck pain. (*Id.* at 267) Upadhyay also noted "carpal tunnel syndrome" at that time, and ordered bilateral wrist splints. (*Id.*) Plaintiff was given exercises to ease his neck pain. (*Id.*) On March 7, 2006, plaintiff treated with Rowe, who noted that plaintiff was experiencing pain from using a "CAM boot" on his ankle and should have testing repeated. (*Id.* at 358) X-rays indicated a "comminuted left calcaneal fracture," and

---

[12]In February 2006, plaintiff was taking Motrin 600mg, Cymbalta, Paxil, Avinza, Percocet, and Doxepin. (D.I. 13 at 265)

9

Rowe again noted a decrease in flexibility and ankle tenderness. (*Id.* at 357) Percocet was prescribed. (*Id.* at 358)

Plaintiff did not complain of neck pain at his April 2006 visit with Upadhyay. (*Id.* at 269) Upadhyay noted that plaintiff was working 10-20 hours per week at that time. (*Id.*) On April 18, 2006, Rowe examined plaintiff and administered a Medrol/Mercaine injection into his ankle. (*Id.* at 355) Rowe noted "advanced degenerative changes consistent with posttraumatic arthritis" and no real changes between x-rays taken that date and plaintiff's previous films. (*Id.*) Vicotin was prescribed for pain.[13] (*Id.*)

Upadhyay noted plaintiff's chronic back pain again in May 2006 and, in addition, a new complaint of right shoulder pain. (*Id.* at 269) Upadhyay stated that plaintiff's depression was "markedly improved since he is working" despite the new complaints of pain. (*Id.* at 270) He recommended that plaintiff find "more sedentary work." (*Id.*)

On June 1, 2006, plaintiff presented to Upadhyay with chronic left ankle pain, right shoulder, and back pain. Upadhyay noted that plaintiff "has been using ladders more, which seems to increase his left ankle pain." (*Id.* at 272) Plaintiff had seen a psychiatrist. (*Id.*) Upadhyay noted low back pain, progressively worsening right shoulder impingement, and left ankle post traumatic arthritis. (*Id.*) He continued plaintiff's pain medications. (*Id.*)

On June 9, 2006, plaintiff treated with Rowe, who reviewed a MRI of the left ankle. (*Id.* at 356) Rowe noted that plaintiff was treating with "Dr. Nathan" for pain

---

[13]Plaintiff was informed that this was the last pain medication prescription he would be given by Rowe. (D.I. 13 at 355)

10

management.[14] (*Id.*) On June 29, 2006, Upadhyay noted that plaintiff "stopped working" but his shoulder pain is worse since his last visit. (*Id.* at 274) A lidocaine/steriod injection was given and an MRI of plaintiff's right shoulder was ordered. (*Id.*)

On June 23, 2005, plaintiff executed a "Function Report" in connection with his application for SSI. (*Id.* at 132-39) In this report, plaintiff stated that he cooks twice per day, does light house cleaning, food shopping once a week, and his own laundry; his father helps with cleaning. (*Id.* at 134) He stated that he can no longer bowl or play ball with his son, but still attends church and Alcoholics Anonymous meetings three to four times per week. (*Id.* at 136) According to plaintiff, he could not lift over 5 pounds, walk for more than 30 feet, or pay attention for long. (*Id.* at 137)

Plaintiff's low back pain complaints continued through July 2006. A prescribed MRI had not been completed.[15] In August 2006, Dr. Lyndon B. Cagampan, M.D. of Uradhyay's practice ("Cagampan") noted that plaintiff claimed his right shoulder pain had worsened, and noted right shoulder tendonitis in addition to chronic back pain and left ankle pain. (*Id.* at 278) Plaintiff received an injection for his shoulder. (*Id.* at 279)

On September 25, 2006, Cagampan noted an improvement in plaintiff's shoulder pain but noted that plaintiff's back and ankle pain had worsened. (*Id.* at 280) Cagampan also noted a high white blood cell count with no history of infections. (*Id.* at 281, 303) Plaintiff's pain medications were refilled, and Zanaflex was added for back

---

[14]Records from Dr. Nathan do not appear to be of record.

[15]Smith noted that plaintiff did not get the ordered MRI because he traveled to Virginia to visit his newborn daughter at that time. (D.I. 13 at 276)

11

spasms. An EMG of his left leg was also ordered. (*Id.* at 281)  Plaintiff reported doing well on his pain medications, and that "[h]e is able to function normally and is active in his daily activities." (*Id.* at 280)  Without medication, plaintiff experienced "severe back pain." (*Id.*)

Plaintiff received an MRI of his shoulder on September 26, 2006, which revealed a "large full thickness tear of the suprasponatus tendon" and "subacromial bursitis." (*Id.* at 300)  An EMG of plaintiff's left leg, conducted September 27, 2006, yielded findings "consistent with a left L5 and S1 radiculopathy with superimposed neuropathy[.]" (*Id.* at 284)  In October 2006, Cagampan reported no new issues regarding plaintiff's back and leg pain. (*Id.* at 285)  Cagampan administered a shoulder injection, recommended a surgical evaluation for the shoulder, and referred plaintiff to Smith for continued back injections. (*Id.* at 286)

Plaintiff received an MRI of his lumbar spine following reported backache on October 17, 2006. (*Id.* at 298)  That test showed a mild disc bulge at L3-L4 and at L5-S1, and a resected disc at L4-L5, with no evidence of recurrent or residual disc herniation. (*Id.*)  The impression was "postoperative changes at the L4-L5 disc level without recurrent or residual disc disease.  Degenerative changes are seen elsewhere without significant spinal canal or neural foraminal narrowing." (*Id.* at 299)

In November 2006, Cagampan added a prescription for Nortiptyline "to improve [plaintiff's] mood" and sleep.  Plaintiff was counseled to avoid heavy lifting, prolonged sitting and frequent bending. (*Id.* at 289)  Cagampan noted that plaintiff's shoulder was "a lot better after the injection" and that he was able to do overhead activities with less

12

pain. (*Id.*) Plaintiff reported that he "is functional and is able to do his daily activities in life, and has a good quality of living with the Percocet and Avinza." (*Id.* at 288)

Plaintiff received a caudal epidural corticosteroid injection in his back from Smith in January 2007. (*Id.* at 293) Plaintiff was seen by Dr. Eric T. Schwartz, M.D. ("Schwartz") of Delaware Orthopaedics & Sports Medicine, P.A. for a reevaluation of his right shoulder in January 2007 and again in February 2007. A "right shoulder rotator cuff tear with atrophy" was diagnosed upon review of a February 1, 2007 MRI of plaintiff's shoulder.[16] (*Id.* at 332, 335-39) Schwartz noted that plaintiff may be able to modify his activities and increase tolerance of the symptoms, otherwise, the tear will not heal on its own and surgery should be considered. (*Id.* at 332)

As part of plaintiff's appeal to the ALJ's decision against him, plaintiff submitted a medical report from Rowe dated June 29, 2007. (*Id.* at 344-45) Rowe's report referenced a bone scan dated June 22, 2007, evidencing "severe inflammatory arthritis," an x-ray taken June 20, 2007 evidencing "severe degenerative changes of the first MP joint," and an MRI taken June 25, 2006 evidencing a left ankle fracture deformity and degeneration.[17] (*Id.* at 345) Rowe concluded that plaintiff may need a fusion or joint replacement in his ankle "because of the severity of the arthritic

_____

[16]The radiologist noted a "large full thickness tear involving the supraspinatus tendon with slight retraction of the tendon," degenerative changes in that tendon, and bursitis. (D.I. 13 at 338)

[17]Specifically: "Left ankle fracture deformity involving the calcaneous with step-off and loss of Bohler angle, and flattening of the calcaneus impinging upon the distal tibia, and peroneal tendon complex scarring, fibrous anterior talofibular and calcaneofibular ligament component with flattening degeneration, and longitudinal split of the peroneus brevis tendon[.]" (D.I. 13 at 345)

13

changes." (*Id.*) Rowe noted that plaintiff had "a history of a previous ankle fusion" and
was ambulating with a cane. (*Id.* at 346)

## C. Medical Opinions Regarding Residual Functional Capacity

Several "medical certifications" appear of record made by Upadhyay to Delaware
Health and Social Services ("DHSS"). On October 12, 2004, Upadhyay filled out the
form to indicate that plaintiff was unable to perform his usual occupation, that Upadhyay
did not permit plaintiff to perform any other work on a full time basis, and that plaintiff's
condition had an estimated duration of three months. (*Id.* at 328)

Upadhyay completed a "Physician's Statement" on January 21, 2005, in which
he stated that plaintiff reported that "he cannot sit or stand for long periods of time and
that he frequently has to lie down to take the pressure off his back," and that "sitting
aggravates his condition." (*Id.* at 151-52) Upadhyay opined that plaintiff can not lift any
objects over "5 to 10 lbs." and cannot "work on a regular basis in a competitive manner"
due to his pain. (*Id.* at 151)

Upadhyay submitted another medical certification to DHSS on May 10, 2005, in
which he indicated an estimated duration of illness of more than 12 months. (*Id.* at
329) On June 13 and June 26, 2006, Upadhyay submitted additional forms. The June
13 form indicated that plaintiff's back, shoulder and ankle conditions were "indefinite,"
while the June 25 form indicated a duration of 6-12 months for plaintiff's back problems.
(*Id.* at 343, 330) On June 13, Upadhyay remarked that "the patient cannot work in any
capacity." (*Id.* at 343)

Chester filled out a "Supplemental Questionnaire as to Residual Functional

14

Capacity" in connection with her August 2005 evaluation. (*Id.* at 181)  On this form, Chester noted that plaintiff had no impairment with respect to performing simple, repetitive, or varied tasks. (*Id.* at 181-82)  Chester noted a "mild" degree of impairment regarding plaintiff's:  (1) ability to relate to others; (2) deterioration in personal habits; and abilities to (3) comprehend and follow instructions; (4) perform work requiring frequent contact with others; (4) perform work with minimal contact with others; and (5) perform complex tasks. (*Id.* at 181)  Chester noted a "moderate" impairment with respect to the estimated degree of restriction on plaintiff's daily activities (such as socializing) and the degree of constriction of plaintiff's interests. (*Id.*)

On August 16, 2005, Carlene Tucker-Okine, Ph.D. ("Tucker-Okine") completed a "Mental Residual Functional Capacity Assessment" form on behalf of the Delaware Disability Determination Service.  Upon examination, Tucker-Okine found that plaintiff was "not significantly limited" in most areas of work-related activities. (*Id.* at 191-208)  Tucker-Okine checked three areas of "moderate" limitation:  plaintiff's abilities to work in coordination or proximity to others without distraction; complete a normal work day and work week without interruptions and at a constant pace; and to get along with coworkers socially. (*Id.* at 191-92)  Tucker-Okine stated that plaintiff's "interpersonal difficulties appear to stem from a personality disorder" and, notwithstanding, "[i]t is probably fair to say that his legal problems as well as his affective and personality disorders may have been exacerbated by his poly-substance abuse problems." (*Id.* at 193)  She noted that plaintiff "is only somewhat credible given his history of substance abuse." (*Id.*)  Tucker-Okine concluded that plaintiff "appears to be able to handle work

15

related mental tasks, perhaps in a low social environment," as his memory, abstract reasoning, insight and judgment appeared intact. (*Id.*)

State agency physician Vinrad Katerie ("Katerie") evaluated plaintiff in September 2005 for his back injury and issued a Physical Residual Functional Capacity Assessment in connection therewith. It was noted that plaintiff could occasionally lift or carry 20 pounds, frequently carry 10 pounds, sit and/or walk with normal breaks for about 6 hours in an 8-hour workday, and could push or pull on an unlimited basis. (*Id.* at 214) Plaintiff could occasionally climb, balance, stoop, kneel, crouch, or crawl. (*Id.* at 215) Katerie stated that plaintiff required postural limitations and a need to avoid concentrated exposure to extreme cold, vibration, and hazards. (*Id.* at 215-20)

Cagampan completed a "Physician's Statement" on January 26, 2007. In this statement, Cagampan stated that sitting aggravates plaintiff's pain, that plaintiff feels it necessary to lie down for an hour twice a day to take pressure off his leg and back, and that plaintiff cannot stand for long periods of time. (*Id.* at 229) Cagampan opined that plaintiff cannot sustain "any kind of work at a competitive level on a 40-hour-a-week basis." (*Id.*)

### D. Hearing Before the ALJ

#### 1. Plaintiff's testimony

Plaintiff testified that his shoulder and ankle prevent him from returning to work as a painter. (D.I. 13 at 381) He is not interested in having vocational retraining.[18] (*Id.*

---

[18]The ALJ asked plaintiff, "So, you wouldn't be interested in having retraining, vocational retraining?" Plaintiff replied, "Not really, not at this point in my life." (D.I. 13 at 382)

at 382)  Plaintiff testified that he did not go back to work after his surgery in 1998.  (*Id.* at 397)  Plaintiff also stated that, in contrast to Cagampan's records, he was not working in March of 2006; he was merely helping advise a friend on how to do a painting job.  (*Id.* at 380)  Plaintiff stated that he was treated for heroin addiction in June 2002.  (*Id.* at 405-06)

Plaintiff testified that the pain in his left leg is his worst pain.  (*Id.*)  He has persistent pain in his lower back that shoots down his left leg whenever he is standing or walking.  (*Id.* at 385)  Plaintiff could not identify a particular source for his shoulder injury.  (*Id.* at 387)  Plaintiff has daily shoulder pain.  (*Id.* at 388)  Regarding his ankle, plaintiff stated that he has pain with movement.  (*Id.* at 390)

Plaintiff testified that he can walk for only minutes at a time, and can walk up and down stairs, although he tries to avoid them.  He cannot sit for more than an hour.  (*Id.* at 396-97)  Plaintiff cannot bend at the waist without severe pain, but can kneel.  (*Id.*)  He sleeps about four hours per night.  (*Id.* at 398)  Plaintiff lives with his father, who generally does all of the shopping and cleaning.  (*Id.* at 399)  On a typical day, he reads magazines and watches television "all day long," taking an hour to lie down twice a day.  (*Id.* at 401-02)

### 2. Vocational expert testimony

Following plaintiff's testimony, the ALJ heard testimony from VE Tony Melanson. The VE testified that plaintiff's painting skills would not transfer to lower levels of exertion.  (*Id.* at 408)  For his hypothetical, the ALJ asked the VE regarding the capacity of a person who:  has a 12th grade education, prior work history as a painter, limited to

17

a "light level of exertion, all the posturals occasional except never climbing any ladder, rope, or a scaffold[,] [r]eaching overhead would be frequent rather than constant[,]" despite the semi-skilled nature of painting, the work would be "limit[ed] to simple, unskilled work," "avoid[ing] concentrated exposure to extremes in cold and vibration," and performing work "not . . . at a production pace" such as an assembly line. (*Id.* at 408-09) The VE testified that these restrictions would eliminate plaintiff's past relevant work as a painter, but that such a hypothetical individual could perform unskilled, light work as a gate tender, mail clerk, or an order clerk. (*Id.* at 409)

The ALJ then added a restriction, consistent with Cagampan's opinion, to a sedentary level of exertion with a sit/stand option with limited bending. The VE testified that a hypothetical individual with these limitations would be able to perform work as a security monitor and an information clerk. (*Id.* at 410) The VE admitted that, if plaintiff's testimony were deemed credible concerning his pain and need to lie down on an unscheduled basis, no jobs would exist that he could perform. (*Id.*) Further, if plaintiff "wasn't able to use his right dominant arm," there would be no sedentary jobs that plaintiff could perform. (*Id.* at 413)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler,* 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the

18

ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. The inquiry performed is the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-51 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence–particularly certain types of

19

evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

## IV. DISCUSSION

### A. Regulatory Framework

Social Security Administration regulations incorporate a sequential evaluation process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the ALJ considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work. If the claimant cannot perform his past work, then step five is to determine whether there is other work

in the national economy that the claimant can perform. *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000) (citing 20 C.F.R. § 404.1520). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. 20 C.F.R. § 404.1520(a). It is within the ALJ's sole discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

The ALJ is required to evaluate all of the medical findings and other evidence that supports a physician's statement that an individual is disabled. The opinion of a treating or primary physician is generally given controlling weight when evaluating the nature and severity of an individual's impairments. However, no special significance is given to the source of an opinion on other issues which are reserved to the ALJ, such as the ultimate determination of disablement. 20 C.F.R. §§ 404.1527(e)(2) & 404.1527(e)(3). The ALJ has the discretion to weigh any conflicting evidence in the case record and make a determination. 20 C.F.R. §§ 404.1527(c)(2).

## B. The ALJ's Decision

The ALJ considered the medical evidence of record and testimony received at the hearing, and concluded that plaintiff retains the capacity for work and is not disabled as defined by the Social Security Act. The ALJ made the following enumerated findings.

1. The claimant has engaged in substantial gainful activity since September 15, 1997, the alleged onset date[.]

(*Id.* at 16) In this regard, the ALJ noted that plaintiff admits to working as a drug dealer between 2000 and 2003 to support his habit, and worked part-time as a painter in

21

November and December 2003 and from at least March 2006 through June 2006. The ALJ continued to determine plaintiff's eligibility for benefits prior to January 1, 2000 and since June 30, 2003, carving out the period of drug dealing. She noted that the evidence of painting in 2003 and 2006 does not constitute substantial work activity although it is probative to the case. (*Id.* at 17)

> 2. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, right shoulder dysfunction, and depression (20 C.F.R. § 416.920(c)).

The ALJ consequently found that claimant's left ankle pain, left elbow pain, poly-substance abuse (in remission) and hepatitis C are "not severe" under the standard because they "cause no more than minimally vocationally relevant limitations." (*Id.* at 18) The ALJ noted that plaintiff did not follow up with Barton for his ankle pain after his August 2005 visit, when plaintiff was wearing his brace and reported an improvement. (*Id.* at 17) There were no follow up treatments. (*Id.*) Plaintiff mentioned ankle pain to Upadhyay on June 1, 2006, who noted that this resulted from increased use of ladders. (*Id.* at 18)

> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).

Regarding plaintiff's right shoulder impairment, the ALJ noted that plaintiff lacks: (1) "major dysfunction of his joints characterized by gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion;" (2) imaging studies showing joint space narrowing, bony destruction or anyklosis of the affected joints; or (3) an inability to perform fine and gross movements ineffectively as defined by statute. (D.I. 13 at 18) Regarding plaintiff's degenerative

22

disc disease, the ALJ noted the absence of: (1) compromise of a nerve root or the spinal cord; (2) evidence of nerve root compression; (3) motor loss; (4) spinal archnoiditis (characterized by dystesthesia, resulting in the need for postural changes more than once every two hours); or (5) lumbar spine stenosis, resulting in an inability to ambulate effectively as defined by statute. (*Id.*)

Regarding plaintiff's depression, the ALJ noted that plaintiff's symptoms meet the "A" criteria of section 12.04 of 20 C.F.R. part 404, Appendix 1. She specifically noted that plaintiff's symptoms cause "mild restrictions in activities of daily living, mild difficulties in maintaining social function and moderate deficiencies of concentration and attention." (*Id.* at 19) She found that there was no evidence of any of the "C" criteria as required by section 12.04, for example, marked restrictions in daily living activities or social functioning, or three or more episodes of decompression in a work setting. (*Id.*)

Finding No. 4 is the most comprehensive portion of the ALJ's opinion, as follows.

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and/or carry up to ten pounds frequently; stand and/or walk up to two hours overall in an eight hour workday; and sit the entire workday. He should avoid complex and detailed tasks and instructions as found in skilled and semi-skilled work, but can understand, remember and carry out simple tasks and instructions. He can tolerate occasional overhead reaching. He cannot do work at a production pace, such as assembly line work or piece work. He can have only occasional contact with coworkers. He can only do limited bending and must be able to change positions (sit/stand) periodically.

(*Id.*)

The ALJ found plaintiff's statements "concerning the intensity, persistence, and limiting effects of [his] symptoms . . . not entirely credible." (*Id.* at 21) Specifically, the ALJ cited the following inconsistencies: (1) plaintiff's indication in written documentation that he does light cleaning, laundry, and uses public transportation, while he testified to

23

the contrary; (2) plaintiff indicated that his ankle injury resulted from a fall and separately from a fight; and (3) plaintiff testified that he has been drug-free since June 2002 but reported in August 2005 that he used drugs until 2003. (*Id.*) Plaintiff's testimony "contradicted . . . in large part" the medical records. (*Id.*) The ALJ also noted (in detail) plaintiff's medical records from 2006 which indicated that plaintiff's depression had improved because he was working, noting that working had aggravated some of his physical symptoms. (*Id.* at 22)

The ALJ gave "little weight" to Upadhyay's RFC assessment of January 2005 that plaintiff could not work on a regular basis because it was deemed to contradict: (1) Upadhyay's statement on February 18, 2005 that plaintiff's pain was well controlled until he was sweeping snow; (2) Upadhyay's treatment notes "clearly indicat[ing] that [he] felt the claimant could work only part time doing physical work but could work full time doing sedentary work"; (3) Upadhyay's consistent notations of plaintiff's normal gait, ability to move around the examination room and get on and off the examination table, as well as his normal strength and reflexes; and (4) Upadhyay's "urg[ing] the claimant to seek out vocational rehabilitation services." (*Id.* at 23)

The ALJ also gave "little weight" to Cagampan's January 2007 opinion indicating that plaintiff cannot sustain any full time work. (*Id.*) The ALJ noted that this opinion conflicts with Cagampan's records through November 2006 which indicated that treatment had helped plaintiff's back and shoulder pain and in which he recommended avoiding heavy lifting, prolonged sitting and frequent bending to maintain that improvement. (*Id.*) Additionally, the ALJ noted that Cagampan did not express an

opinion regarding plaintiff's "actual [RFC], but merely opined that he could not work full time." (*Id.*)

The ALJ found that the GAF of 50 given by Chester "inconsistent with the [RFC] assessment she completed and her narrative, as well as the narrative of Upadhyay, indicating that plaintiff was generally stable on his medications. (*Id.* at 23) The ALJ further noted that plaintiff never followed up on Upadhyay's advice to see a psychiatrist for treatment. (*Id.*)

In view of the foregoing, the ALJ concluded that "[t]he alleged severity of the claimant's pain and other symptoms are not supported by the medical records. While the claimant's impairments are severe in that they have more than a minimal effect on his ability to function, they are not totally disabling and do not preclude the performance of all substantial gainful activity." (*Id.* at 24)

The ALJ also found as follows.

5. The claimant is unable to perform any  past relevant work (20 C.F.R. § 416.965)

6. The claimant was born on August 3, 1958 and was 39 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 C.F.R. § 416.964).

7. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 416.964).

8. Transferability of job skills is not material to the determination of disability[.] [U]sing the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (see SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 416.960(c) and 416.966).

25

In this regard, the ALJ cited the testimony of the VE and provided that, "[b]ased on the entire record, including the testimony of the [VE], the undersigned concludes that, considering the claimant's age, education, work experience, and [RFC], the claimant has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (*Id.* at 25) Finally, the ALJ found that:

10.  The claimant has not been under a "disability," as defined in the Social Security Act, since September 29, 2004, the date the application was filed (20 C.F.R. § 416.920(g)).

### C. Analysis

Plaintiff argues that the ALJ's determination was not based upon substantial evidence because it:  (1) failed to give appropriate weight to the opinions of plaintiff's treating physicians; (2) rejected plaintiff's testimony regarding his subjective complaints; and (3) improperly relied on the VE's testimony, which was based on a flawed hypothetical omitting several limitations described by the treating physicians.  The court addresses these arguments in turn.

### 1. Opinions of plaintiff's treating physicians

As plaintiff's treating physicians, Upadhyay and Cagampan's opinions are entitled to special significance and, when supported by objective medical evidence of record and consistent with other substantial evidence of record, are entitled to controlling weight. *See Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)).  The ALJ cannot disregard the opinion of a treating physician without explaining the reasoning for rejecting the opinion and referencing objective medical evidence conflicting with the opinion. *See Gilliland v. Heckler*, 786 F.2d 178,

184 (3d Cir. 1986). Where conflicting medical evidence is presented, the ALJ may properly resolve the conflict. See Richardson v. Perales, 402 U.S. 389, 399 (1971).

As noted previously, the ALJ gave "little weight" to Upadhyay's RFC assessment of January 2005 that plaintiff could not work on a regular basis because it was deemed to contradict his own records in several respects, including Upadhyay's own urging of plaintiff to seek vocational retraining (D.I. 13 at 261), recommendation that plaintiff find "more sedentary work" (id. at 270), notation that plaintiff's pain was "well controlled" prior to the snow-shoveling exacerbation (id. at 165), and Upadhyay's multiple notations regarding plaintiff's ability to move about the exam room without difficulty. The ALJ sufficiently referenced the conflicting evidence she relied upon in discrediting Upadhyay's assessment.

As noted by the ALJ, Cagampan did not assess any specific functional limitations. (Id. at 229-30) Cagampan's general opinion that plaintiff cannot work was, therefore, both unsupported by actual findings and contradicted by his own November 2006 notes showing that, with treatment, plaintiff was improving. The court finds that the ALJ pointed to sufficient evidence in both regards.

As plaintiff points out, the ALJ did not specifically note the opinions of Smith or Rowe in her opinion. Smith saw plaintiff for chronic low back pain and administered several injections. Rowe primarily treated plaintiff's left ankle injury. Neither physician assessed any specific functional limitations. The ALJ acknowledged that plaintiff's "impairments are severe in that they have more than a minimal effect on his ability to function," though they are not disabling in her opinion. The court assigns no error in this regard.

27

Additionally, and though not specifically noted in the ALJ's opinion, the physical RFC assessment of state agency physician Katerie clearly contradicts those of Upadhyay and Cagampan. It was Katerie's opinion that plaintiff can work with postural limitations for about 6 hours with normal breaks. (D.I. 13 at 215-20) The ALJ's decision to discredit plaintiff's physicians, therefore, is supported by this additional basis.

### 2. Plaintiff's testimony

Plaintiff argues that the ALJ improperly rejected his testimony regarding his subjective complaints, specifically, that he must lay down to have relief from his back pain and spasms. (*Id.* at 385) According to the regulations, "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p. In this case, plaintiff's testimony was contradicted by past medical records and his own prior statements, and appropriately the subject of a credibility determination by the ALJ.

First, as the ALJ noted, there are several general inconsistencies between plaintiff's statements made at different points in the record. Plaintiff told Smith that he injured his ankle in a fight, but told Barton and Rowe that he injured his ankle in a fall. (D.I. 13 at 247, 228, 356) Plaintiff claimed at the hearing that he did not work in 2006, while he told Upadhyay on at least four occasions between February 2006 and June 2006 that he was working and using ladders. (*Id.* at 380, 265, 267, 270, 272) Dr. Rowe also noted that plaintiff "stopped working" in late June 2006. (*Id.* at 274) Plaintiff

28

testified that he is in too much pain to work, but acknowledged in a 2005 report he could do light house work, shop, and attend church and Alcoholics Anonymous meetings. (*Id.* at 134, 136) Plaintiff admits to working for a drug dealer between 2000 and 2003 to subsidize his heroin addiction.[19] (*Id.* at 183) Plaintiff testified at the hearing, however, that he has been clean since June of 2002. (*Id.* at 406) Plaintiff previously told Delaware Disability Determination Service that he entered rehabilitation in 2003. (*Id.* at 183) Several of these inconsistencies bear on plaintiff's overall credibility, while others create a direct conflict with Upadhyay and Cagampan's RFC assessments that plaintiff is not capable of any full time employment (whether sedentary or otherwise).

Plaintiff himself testified at the hearing that he was not interested in vocational rehabilitation, not that he was unable to do so. (*Id.* at 382) The record contains numerous instances where plaintiff reported that his pain was being managed. Plaintiff reported improvements in his pain to Upadhyay in November 2004 ("pain is much improved") and in February 2005 ("pain was previously well controlled"). (*Id.* at 235, 165) In September 2006, plaintiff reported to Cagampan that his pain medications allowed him to function normally and remain active. (*Id.* at 280) Cagampan noted again in November 2006 that plaintiff was "functional," able to do his daily activities, and had a "good quality of living" with his pain medications. (*Id.* at 288) Not only does this

---

[19]Assumedly, this work was not strictly sedentary. The court also notes that plaintiff seemingly engaged in other activities during the relevant timeframe that were not sedentary, for example, he appears to have served jail time in the summer of 2005 for a crime of some nature and fathered a child in 2005. He also traveled to Virginia in 2006 to visit the child. The court does not base its review of the ALJ's findings upon these impressions.

29

evidence contradict plaintiff's subjective complaints of severe and debilitating pain, but an impairment cannot serve as the basis for disability if it can be reasonably controlled by treatment or medication. *See Dearth v. Barnhart,* 34 Fed. Appx. 874 (3d Cir. 2002) (citing *Gross v. Heckler,* 785 F.2d 1163, 1165-66 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling") and 20 C.F.R. § 404.1530 ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work.")).

The ALJ found that plaintiff cannot return to his past work as a painter. Therefore, she did not find plaintiff's complaints completely incredible or reject them outright. In view of the conflicting evidence of record, the ALJ was entitled to make a credibility determination with respect to the severity of plaintiff's subjective complaints of pain. Her finding these complaints "not entirely credible" (*id.* at 21) and "not supported by the medical records" (*id.* at 24) was adequately supported by the record and the detailed explanation of such provided in the ALJ's opinion.

### 3. The VE's testimony

Plaintiff argues that the hypothetical question posed to the VE was "noticeably absent" for the limitations described by Upadhyay and Cagampan. (D.I. 16 at 20) That is, if plaintiff had a great deal of difficulty using his right arm on a regular basis or had to lie down due to chronic back pain, no work would be available. (*Id.*; D.I. 13 at 413-14) Work would also not be available if plaintiff had a GAF of 50 as described by Chester. (D.I. 16 at 21; D.I. 13 at 414)

An ALJ's hypothetical question need only include impairments that are supported

30

by the record. *See Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1997) (citations omitted). As discussed previously, the ALJ was entitled to discount Chester's assessment of a GAF of 50 as inconsistent with Chester's own evaluation notes. Plaintiff points to no medical evidence substantiating his claim that he needs to lie down consistently to relieve pain. (D.I. 16 at 20-21; D.I. 19 at 6) Similarly, there is no medical evidence or RFC assessment describing an inability to use plaintiff's right arm. While the record generally supports plaintiff's complaints of pain in his right shoulder (resulting from a torn rotator cuff (D.I. 13 at 332, 335-39)), there is no indication that this condition either cannot be surgically corrected or that it results in an inability to use plaintiff's arm. In fact, Schwartz noted that plaintiff may be able to increase his tolerance of his shoulder symptoms with modified activities. (*Id.* at 332) The court assigns no error to the ALJ's question to the VE, and the ALJ was entitled to rely on his opinion.

## V. CONCLUSION

In view of the foregoing, substantial evidence supports the ALJ's determination that plaintiff is not disabled and is capable of sedentary work. Plaintiff's motion for summary judgment (D.I. 15), therefore, is denied and defendant's motion for summary judgment (D.I. 17) is granted. An appropriate order shall issue.

31